[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
Plaintiff, Anna Maria Johnson, seeks a dissolution of her marriage of almost 27 years to the defendant, Arthur Johnson. The parties were married in Middletown, Connecticut on a November 30, 1974. Both have lived in Connecticut since then. The court has jurisdiction.
There is one child and the issue of the marriage. That is Liza Marie, born April 29, 1978. She is a college graduate pursuing further studies in Louisiana.
Very early in her testimony, plaintiff was asked by her attorney, "Why are you here today?" Plaintiff answered:
"I'm here to defend myself, get what I feel is my equitable share of the marital assets." {3} CT Page 15035
Plaintiff is 54 years old. She is a graduate of the Southern Connecticut State University. She also has a Master's Degree in Art Education from that University.
Plaintiff taught art in the Berlin school system for 28 years. She stopped teaching in 1996. Since then, she has not worked. She has been on disability for a variety of mental disorders. The disability is probably permanent. There is no likelihood she will ever have meaningful employment again.
Defendant is 54 and a graduate of Northeastern University. He has a Bachelor's Degree in Civil Engineering. He is a civil engineer. He has held steady employment since before the marriage. He continues in that same employment. He is employed by URS Corporation. He is currently and temporarily assigned to a road building project in Massachusetts.
Plaintiff's mental illness has pervaded this marriage. It has negatively effected the marriage almost from its beginning.
Plaintiff testified she now suffers from tardive dyskinesia and Tourette's syndrome. {18} Her treating psychiatrist, whom she sees weekly, says she is also treating for Bipolar Disorder. Further, Plaintiff "continues to experience symptoms of hypomania which render her disabled. These include poor judgment, delusional thinking, irritability, insomnia, pressured speech and a tendency to misattribute meaning to other's statements and actions." At present, the treatment goal "is to prevent hospitalization and to allow her to function in the community." The structure of the present psychotherapy includes "reality testing, support and insight" "which have enabled her to continue her day to day life." Affidavit of Carol Starr, M.D., June 13, 2001, ¶¶ 4, 5, 9, 11, and 12. Exhibit 6.
Just after Liza was born, plaintiff was hospitalized for some time. Although working full time, defendant, with the help of plaintiff's parents, cared for Liza. Defendant carried on as the person substantially rendering the child care after plaintiff's release from the hospital. Plaintiff acknowledged defendant's expanded role in Liza's care but described it in the derisive, "excessively."{ } Defendant, more kindly stated "Ann Marie tried to be a good mother. { }
Several times during the marriage plaintiff required hospitalization for extended periods. Defendant cared for the baby and ran the household. Even when plaintiff was not hospitalized, defendant manned the laboring oar in keeping the household going. He did the cleaning, laundry, cooking, etc. Defendant did the household and yard maintenance. CT Page 15036 He did the repairs as needed. He also did much of the shopping. He was a major provider of Liza's care.
Five years ago, when plaintiff was applying for disability, she was more appreciative of defendant's contributions. She wrote to the Teachers' Retirement Board all but extolling defendant and the added burdens he had undertaken in caring for her, their child, and the household; all the while defendant held down a full time job.
Plaintiff early on was a sad person. That turned to anger. Defendant became the object of most of her anger. He was blamed for everything, eventually including her illness. Plaintiff has suggested in her testimony that defendant was unsupportive. {73-74} Plaintiff claims defendant once took her to the hospital "and threatened to leave [her] there at three o'clock in the morning." {74} Defendant testified about this incident. treated with at least seven psychiatrists. Defendant took plaintiff to her appointments with her psychiatrists. On plaintiff's directive, no psychiatrist ever talked to defendant about her illness, diagnosis, etc. Plaintiff herself did not disclose to defendant what was discussed with the psychiatrists; she "didn't think it was any of his business." {78} The preservation of the confidentiality and privacy was certainly plaintiff's right and prerogative. But in this case, it had adverse effects on the marriage. Plaintiff is responsible for those consequences. In any event, the court does not find defendant to have been unsupportive of plaintiff. The evidence is quite to the contrary.
Nevertheless, defendant cared for her constantly. He took her to her appointments and to the hospital whenever she asked. {135}
Plaintiff instituted this action. It was wholly her decision to have the marriage dissolved. There is no evidence defendant sought to be released from his vows.
The touchstone of plaintiff's effort "to defend [herself], get what I feel is my equitable share of the assets" is the primary offensive claim stated in her brief. "This case involves
A. We went to the emergency room.
Q. Why did you go to the emergency room?
 A. She was having reactions to her medicines. She had called the psychiatrist, and we only got her answering service. And the evening went on, we decided to go to the emergency room. She was, she was in bad shape. She was nervous, and we went to CT Page 15037 the emergency room.
 It wasn't our first time, and basically we were getting no service and Ann Marie was yelling at me as a vehicle to get back at the doctors. They're not doing anything, go make um. I don't — "Ann Marie, let's not make an incident. If you're going to yell and scream, I'm going to have to leave."
 She started to yell some more, I left. I went down to the coffee machine, I got a coffee and I came back. I took a timeout. I'd never abandon my wife. {136}
The court believes the defendant.
Plaintiff could not drive an automobile. Defendant took plaintiff to her medical appointments. Over the years, plaintiff the dissolution of a 28 [Sic.] year marriage, complicated by issues of Mr. Johnson's domestic violence towards Mrs. Johnson arid Liza Marie Johnson (the parties' 23 year old daughter). Plaintiff's Trial Brief, June 21, 2001, p. 1. 
The court has examined the evidence regarding the claimed violence. Plaintiff states defendant "exhibited sporadic domestic violence." Id., 2. Significantly, plaintiff never testified that the claimed violence was a cause of the marriage breakdown.
Plaintiff testified about three incidents directed to her and one to the daughter, Liza. The court discusses each incident.
Plaintiff claims the first incident occurred two weeks after the marriage. She claims defendant slapped her across the face. She does not remember the circumstances exactly. However she says she and defendant were "kind of bantering and she pushed him on the arm lightly, and he turned and he slapped me across the face." {5-6}
Defendant testified about the incident. The incident occurred early in the marriage but not within the first two weeks. It started out in play. Plaintiff slapped defendant. Defendant told plaintiff: "Don't hit me, or I'll hit you back." "You hit me, I'm going to hit you back." Defendant again hit plaintiff and defendant hit her back. Defendant {133} According to defendant, plaintiff has "hung onto that that I've hit ever since." Id.
Plaintiff testified about an event in 1984.
 "No, in 1984 we were about to go out to a movie; we CT Page 15038 were arguing and he came at me, pushed me down in front of the pantry, hit me in the face, um, I think broke my hand, or — I had to wear a soft cast — and I hurt my coccyx. I had to go to the Emergency Room." {7}
Plaintiff also testified she "had several bruises on her face, and I think it was a broken hand or finger. I don't quite recall the exact." Plaintiff said she believed she had x-rays taken. {7}
Plaintiff did not report she had been hit by her husband to the police "because I didn't want anything in the newspaper." {7}
Defendant testified about this event. At the time, plaintiff who had for years been a sad person became a very angry person. Defendant was often the target of her anger. It was a Saturday. There were verbal confrontations most of the afternoon. Plaintiff told defendant she "was going to go out and tell everybody that I was a wife beater and everything else." As of the time of this incident, plaintiff's testimony shows defendant had hit her once ten years earlier.
Plaintiff went upstairs. When she came down, defendant slapped her. Defendant said: "When you come [calm] down, you can leave and now you can tell people." After a half hour, plaintiff calmed down and left. {134}
Plaintiff also testified about another incident:
 "I'm not exactly sure of the year. It was during my illness. Somewhere between, I would assume, I'd say about 1997. We were arguing over an incident with the checking account and he came at me and gave me a cross between a punch and a slap in the head three times, in the living room. I then moved into the sunroom without thinking that I would be contained there, and he again hit me three or four times there; and then I returned back to the living room and he hit me three or four times there." {16}
Defendant's account differs.
 Q. After the 1984 incident there was another incident that your wife testified to in which you hit her?
A. Yeah.
Q. Do you remember that incident? CT Page 15039
A. Yes.
Q. Approximately, when was it?
A. 1996 or 1997 it's recent, 97.
Q. Okay, what happened?
 A. Again it was a Saturday. Ah, we were very negative, very negative. Ann Marie was right in the middle of her physical problems.
Q. What, what do you
 A. We weren't getting much sleep, and I was getting blamed for everything, and we had a good verbal joust, and I started to walk out of the living room, and I just raised my hands like that. And she says, "You want to hit me, and I snapped. I slapped her twice. She ran into the sunroom which, is a French door. I said, "Don't lean against the French door. You're going to break it."
 I opened the French door, I just put my hands up in the air and I walked out to the kitchen. I was at the sink. She came up behind me and started laying into me again, and I turned around and I slapped her once, one stinging slap. I hit her a total of three slaps.
Q. After that, did you apologize to her?
 A. No, when she accused me of hitting her 17 times, it was never a chance. Originally, it was 16 times. It was four times in four rooms, and then it would change to four times in three rooms. And it's-the numbers going all over the place, and it's been unrealistic.
Q. Are you sorry you hit her?
 A. I am definitely sorry, I apologize for the 1984 incident, but I've never apologized for the 1997. {140-141}
Plaintiff brought up an incident with Liza, the daughter. Plaintiff's CT Page 15040 knowledge of the incident is based entirely on what others told her.
Defendant testified about the incident. Liza was 15, a high school freshman. Plaintiff had gone to school. Defendant drove Liza to school each day.
 "On this particular morning it's, she came down stairs and there's been a lot of tension in the house. There's always a lot of tension. And Liza, I got after her about something and she said: `Dad, I don't give a damn about you. Mom and you.'" Defendant stood up, grabbed her by the arms and I pinned against the wall. `I said: You little ingrate bitch. Your mom and I do everything we can for you and you treat us like this. I don't ever want to hear you talk to me like that again or your mom. Now get in the car." {138-139}
Defendant drove Liza to school. Liza told her school friends of the incident. A guidance counselor got involved. The matter was reported to the police. Just what Liza told is not in evidence. Defendant was arrested. Plaintiff, Liza, and others went to the police to get the charges dropped. He opted to go to family violence program. He successfully completed that program. The charges were dismissed. There is no evidence of lasting animosity between defendant and Liza. The evidence is to the contrary. Liza and her father have since gotten along great. {138-139} Their current relationship is very close.
The court finds defendant's testimony regarding these events the far more credible.
There is only one reason defendant's violence was brought up by plaintiff. It could be relevant to the "causes of the . . . dissolution of the marriage," a consideration for determining property assignments upon dissolution and the amount, if any, of alimony. C.G.S. §§46b-81 and 46b-82. Plaintiff did not testify these events were a cause of the breakdown. Her attorney never even asked her if they were. The court does not find these events were a significant factor in the marriage breakdown.
On the day defendant was to be served, plaintiff left a note for defendant saying therein — "My Dad and I will be going away for a few days to contemplate the reality of the situation and to begin to adjust to my new life." Exhibit B, p. 3.
In court however, plaintiff testified:
CT Page 15041
 "When I served him, um, my father and I went to a hotel in a surrounding town. I feel my husband is a batterer and having read about batterers, I was informed they sometimes ah —." {5}
Plaintiff claims her concerns were based on the "fact that he has hit me a few times and daughter a few times during the marriage." Id.
Again, the purpose of this testimony was to fortify her claim that defendant "has hit me a few times" so the court might attribute defendant's violence as a cause of the breakdown. The court does not. Plaintiff has not testified she feared her husband. The court believes defendant's supposed fear of her husband necessitating her leaving the house for a few days when the dissolution papers were to be served is a contrivance.
The court does not make light of or condone in the slightest the physical actions defendant has admitted against the plaintiff. The court, however does not believe it was a factor in the breakdown of the marriage.
The plaintiff's credibility is a problem. It is a concern to the court. Her motive is clear — "to get what I feel is my equitable share of the marital assets." Her financial affidavit is not accurate. Her testimony on several occasions has been problematic. It may be that her illness effects her truthfulness. Her psychiatrist reports symptoms of "poor judgment, delusional thinking . . . and a tendency to misattribute meaning to others' statements and actions." Her treatment at this time includes "reality testing." Exhibit 6, ¶¶ 9 and 11.
Plaintiff has been unemployed since 1996 due to her disability. That disability is probably permanent. Having been a teacher, plaintiff has been a participant in the Teachers' Retirement System. She now receives a disability benefit of $2,458.19 per month. {58}
When and if plaintiff reaches 60, May 2007, her present disability benefit will cease. Plaintiff will then receive a service benefit of $31,800[$2,650/month] plus cost of living increases.
Defendant earns $75,000 per year. He is healthy and, in all likelihood could make at least that amount until he is eligible for retirement and social security when is 66.
At the present time, defendant is on temporary duty on an out-of-state project. He is working and being paid for significant overtime. He also is being reimbursed for his housing and food expenses. These benefits on an CT Page 15042 annual basis approximate $26,000. The project should be over within a few months.
The parties jointly own a marital home is located at 643 Main St., Cromwell. It has eight rooms including four bedrooms. Both parties testified the property had a fair market value of $180,000 to $200,000. {22,146} Plaintiff's affidavit reports the mortgage balance as $10,000. Defendant's affidavit reports the mortgage balance as $10,000: he testified the balance is probably $5,000. (146) For purposes of this action, the court finds the parties' equity is $190,000.
Plaintiff is living in the home. She wishes to have the home and says she wants to continue living there. An eight room house is far more housing than plaintiff could conceivably need. Plaintiff acknowledged she probably can't afford to stay in house. {52} Plaintiff knows of no reason house should not be sold other than her desire to stay in it.
Defendant vacated the home six months before the trial. {41} He wants to have the house sold and to receive at least one half the proceeds of the sale.
Plaintiff presently receives disability income from the State Teachers' Retirement System. The present amount is $2,458.19 per month. She will continue to receive this amount, plus annual cost of living increments while she is disabled and until she is 60. Plaintiff is probably disabled permanently. She has little chance of accumulating any significant future estate by her own efforts. ["opportunity of each for future acquisition of capital assets and income"]
When plaintiff reaches age 60, she will then be entitled to a retirement benefit. That amount is subject to cost of living increases too.
The retirement benefit plaintiff is entitled to from the State Teachers' Retirement System is significant. If, and only if, plaintiff reaches age 60, she will be entitled to an annual benefit of at least $31,800. The $31,800 amount is the base amount of the benefit which is subject to cost of living increases. Actuarially, this appears to have a value of $387,800. But this figure is deceptive. $387,000 is the present cost for a $31,800 annuity for a woman of plaintiff's age. It does not have that value if plaintiff does not reach age 60. If plaintiff were to die before reaching 60, her estate would only be entitled to the amount she paid into the fund. This is in the order of $80 to $90,000. If plaintiff decided to cash in or withdraw from the retirement plan, she could only collect the $80 to $90,000. If plaintiff actually lived longer than the actuarial life expectancy of woman of her age, she could receive CT Page 15043 far more than $387,800. Thus, $387,800 as the value of plaintiff's retirement benefit is illusory and aids the court little in making an equitable property division.
The State Teachers' Retirement System permits a divorcing participant to assign a part of the retirement benefit to the non-participant spouse. But this assignment is subject to defeasance under several circumstances. While the retirement benefit is a property interest, its value to any one other than plaintiff is elusive. The court has no reason to assign any portion of this benefit to defendant.
Plaintiff also has an Individual Retirement Account (IRA). Its present value is $49,000.
Defendant has a 401(k) plan. There is approximately $278,000 in it. He presently contributes $59 per week to it.
The parties had owned a property in South Carolina. It was sold. The proceeds, $16,000, represented their savings. The $16,000, or the major portion thereof, was used to pay plaintiff's medical bills.
Defendant is, and for some time, has been, contributing $1,000 per month to support their daughter as she attempts to pursue a medical school education. There is no evidence plaintiff objects to this.
Defendant has for some time been paying plaintiff $250 per week pursuant to an agreement.
Over $100,000 of the cost of Liza's Vassar education was paid for by plaintiff's father. Plaintiff makes some claim that the court should somehow give her credit for her father's beneficence to Liza. Plaintiff has not suggested the amount of the credit to her or how the credit should be made. The credible evidence is that plaintiff's father dealt with Liza directly. The court does not give any credit or consideration on this claim.
Defendant has a 401k plan account. Its present value is $278,000. It may continue to grow if plaintiff continues to make contributions to it. In the past his employer has made contributions to it. Whether plaintiff will continue to contribute to it and if so for how long is not known. Whether his employer will continue to contribute and for how long is not known. The amount of this account at some time in the future is speculative. The account may be subject to market fluctuations. And, the court does not know why any increase over the present value which comes about after this plaintiff-induced dissolution should inure to plaintiff's benefit. CT Page 15044
Plaintiff's also claims that defendant's social security retirement benefit should be considered by the court so that such income to defendant can be used in arriving at the property distribution to the plaintiff and in arriving at an alimony amount for her. The evidence, a March 2, 2001, estimated benefits statement from the Social Security Administration, indicates that if plaintiff were to continue earning $61,194 per year until he is 66, his "payment would be about . . . . . . . $1,670 per month." This estimated benefit is based on current law. The estimated benefit is based on future annual earnings of $61,000. He presently makes $75,000 per year. But how long he works and how much he makes in the future are not known. Changes in the law are not known. The court is at a loss to determine how the Social Security benefit defendant may receive years from now can be a telling factor in fixing property distributions and alimony at this time. What plaintiff may receive from Social Security years from now by virtue of his earnings after this dissolution should not impact property distribution and alimony orders to be entered upon dissolution.
The parties pooled their income. Clearly for the last several years, defendant's income was the major source of funds. And, on at least two occasions during the marriage plaintiff was out of work for a year. It appears his income surpassed hers during much, and perhaps, all of the marriage.
The court finds defendant and his conduct were not the major or even a substantial cause of the breakdown of this 27-year marriage.
This marriage has been pervaded by plaintiff's mental illnesses and the effects thereof almost from its beginning. The court's action does not make light of plaintiff's illness and the difficulties she endures. Yet, defendant is not the cause thereof and indeed has cared for her as best he could. For her own reasons plaintiff wants the marriage dissolved. Her wants and needs do not mandate subsumption of equitable treatment of the defendant.
The court has given due deliberation to each of the considerations enumerated in C.G.S. §§ 46b-81 and 46b-82.
 ORDERS
1. The marriage is dissolved on the grounds of irretrievable breakdown.
2. Defendant shall pay plaintiff $1,000 per month in alimony. Alimony shall cease on the remarriage of the plaintiff and/or the death of either CT Page 15045 party.
3. Plaintiff shall retain in full all of her interest in the benefits she is entitled to under the Teachers' Retirement System
4. Plaintiff shall retain in full her Individual Retirement Account.
5. Defendant shall retain in full all of his interest in his 401(k) plan account.
6. The parties shall each be entitled to their present one-half interest in the marital home. Plaintiff has stated she wishes to retain ownership. Plaintiff may purchase defendant's interest for $85,000. Plaintiff shall have until January 10, 2002 to notify defendant in writing if she intends to purchase his interest for $85,000. If plaintiff so elects, she shall pay defendant $85,000 by February 10, 2002.
If plaintiff does not notify defendant by January 10, 2002 of her election to purchase, or sooner notifies him in writing she does not elect to purchase, the property shall be put up for sale forthwith. The parties shall share equally the net proceeds of the sale.
Plaintiff shall be solely responsible for all expenses for the home for so long as she occupies same. This will include the mortgage expenses, taxes, insurance, utilities, maintenance, etc.
7. Defendant shall retain sole ownership of the 1996 Jetta and shall be solely responsible for the debt secured by same.
8. Plaintiff shall retain sole ownership of the 1994 Dodge and shall be solely responsible for any debt secured by same.
9. Plaintiff shall be entitled to the personal property listed on the two-page schedule (yellow lined paper) attached to Defendant's Trial Brief dated June 28, 2001. [113]
Parker, J.